# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | |
|---|---|
| DIONNE JERMAINE STOKES, | CASE NO. 3:22-CV-00584-JJH |
| Plaintiff, | JUDGE JEFFREY J. HELMICK |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Dionne Stokes filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On April 12, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. (Non-document entry dated April 12, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Stokes filed for DIB and SSI on May 7, 2020, alleging a disability onset date of October 7, 2019. (Tr. 225-42, 253). Her claims were denied initially and on reconsideration. (Tr.

124-32, 136-51). She then requested a hearing before an Administrative Law Judge. (Tr. 152-53). Ms. Stokes, represented by counsel, and a vocational expert (VE) testified before the ALJ on October 12, 2021. (Tr. 39-78). On October 26, 2021, the ALJ issued a written decision finding Ms. Stokes not disabled. (Tr. 15-31). The Appeals Council denied Ms. Stokes's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and 416.1481). Ms. Stokes timely filed this action on April 11, 2022. (ECF #1).

Factual Background

I.    **Administrative Hearing**

At the hearing before the ALJ, Ms. Stokes testified she is single and has rented the same house for the past nine years. (Tr. 42-43). At the time of the hearing, Ms. Stokes's youngest daughter, age 20, had recently moved back in, along with Ms. Stokes's two-year-old grandchild. (Tr. 45). Her daughter works full time and the grandchild attends daycare. (*Id.*). Ms. Stokes has three children and five grandchildren. (Tr. 44). She is financially supported by her son and oldest daughter. (*Id.*). Ms. Stokes does not have a driver's license because it was suspended when her daughter was in a car accident in Ms. Stokes's car. (Tr. 46-47). Her health insurance provides transport to doctor's appointments. (Tr. 46). She leaves the house two or three times a week, and will sometimes visit her son's house, which is very close to where she lives. (*Id.*).

Ms. Stokes previously worked at Learning Ladders, a preschool with a baby room and toddler room. (Tr. 47-48). The heaviest Ms. Stokes had to lift at Learning Ladders was a toddler's weight. (Tr. 48). Ms. Stokes was let go from this position because she was unable to keep up with the work due to her conditions, which prevented her from lifting children and changing their

2

diapers. (Tr. 49). At Washington Ohio Services, Ms. Stokes was a laborer, cleaning up oil spills. (*Id.*). She was required to climb scaffolds and lift over 50 pounds. (Tr. 48-49). Ms. Stokes has also worked full-time as a home health aide for disabled persons at Zeigler Habilitation Homes. (Tr. 49).

Ms. Stokes's weight fluctuates between five and ten pounds due to stress. (Tr. 43). In addition to her stress, depression, and anxiety, Ms. Stokes testified she is unable to work due to her neck, lower back, and hands. (Tr. 50-51). Her hands cramp up, swell, get stuck in positions, and ache. (Tr. 52). She does not do a lot of texting and cannot cut meat. (Tr. 52). Her oldest daughter cooks for her and transports her when needed. (Tr. 53). She is unable to vacuum due to decreased range of motion in her left shoulder. (Tr. 55). Often, her daughter will help her get dressed. (Tr. 57). Ms. Stokes's oldest daughter does her mother's laundry. (Tr. 58). Ms. Stokes usually gets her groceries delivered to her house. (Tr. 58-59). She cannot make her own bed. (Tr. 62). She is not able to write legibly because of the pain in her hands. (Tr. 63). On a typical day, she watches TV and reads. (Tr. 50-60).

Ms. Stokes visits the pain specialist clinic at University of Toledo Medical Center (UTMC) and has received injections in her back for pain. (Tr. 55). She takes medications for pain, but they do not help and instead make her very sleepy. (Tr. 57). She is diabetic, but she is not insulin-dependent and her diabetes is controlled. (Tr. 63). She is being treated for mental health issues including depression and anxiety and takes bupropion and trazadone to help her sleep. (Tr. 63-64). Ms. Stokes reported not wanting to get out of bed, go anywhere, or be around people generally. (Tr. 64). She gets anxious around a lot of people and tends to shut down. (Tr. 65). She does not drink alcohol or use drugs. (*Id.*). She experiences crying spells. (*Id.*). She can concentrate on "good

3

days," but she has more bad days than good days. (Tr. 65-66). She does not have problems understanding or carrying out instructions. (Tr. 67-68).

Ms. Stokes is unable to reach her left arm above her shoulder and cannot bend down to pick up a gallon of milk from the floor with both hands and put it overhead. (Tr. 66). While her right shoulder does not prevent the same action on right side, her wrists are too weak to lift a gallon of milk regardless. (Tr. 67).

Despite taking prescribed Topamax, Ms. Stokes suffers from migraines three times weekly when she gets up in the morning. (Tr. 68). When she takes her medication and has a migraine, she is usually "good by 12:00 that day." (*Id.*). It takes three to four hours for the medication to kick in and she is unable to do anything until it does. (Tr. 69). Her sleep is poor, and she usually gets around four or five hours. (Tr. 70-71).

VE Charles McBee then testified.

**Hypothetical One.** VE McBee assumed a hypothetical individual of Ms. Stokes's age and education with Ms. Stokes's work history who is subject to the following limitations: restricted to light work; can frequently climb ramps and stairs; can never climb ladders, ropes, or scaffolds; can frequently balance, stop, kneel, crouch, and crawl; frequently reach overhead bilaterally; can frequently handle and finger bilaterally; must avoid all exposure to unprotected heights and heavy, moving machinery; can understand, remember, and carry out simple instructions; can perform simple, routine and repetitive tasks, but not at a production-rate pace such as an assembly line; can adapt to routine changes in the workplace that are infrequent and easily explained; and can interact occasionally with supervisors and coworkers, as well as the general public. VE McBee testified the individual could not perform any of Ms. Stokes's past work. (Tr. 73-74). The

4

individual could, however, perform light exertion jobs such as housekeeping, cleaner (DOT 323.687-014), merchandise marker (DOT 209.587-034), or sorter (DOT 22.687-014). (*Id.*).

**Hypothetical Two.** VE McBee then assumed the same limitations from Hypothetical One but limited the individual to work only at the sedentary level. (Tr. 74). VE McBee testified the individual could still not perform any of Ms. Stokes's former work. (*Id.*).

**Hypothetical Three.** VE McBee then assumed the same limitations from Hypothetical One (limited to light work) and added that the individual would be absent consistently two days per month, including coming in late and leaving early, due to symptoms. (Tr. 75). VE McBee testified such an individual would not be able to perform the jobs identified because such absences would be unacceptable in competitive employment. (Tr. 75).

**Hypothetical Four.** VE McBee than assumed a person who can only occasionally use bilateral hands for fingering, handling, and feeling. (Tr. 76). In terms of reaching, VE McBee assumed the person could only occasionally reach with the right shoulder overhead but can frequently do so with the left. (*Id.*). VE McBee testified such a person would not be able to do any of the jobs identified under the previous hypotheticals. (*Id.*).

## II.    Personal and Vocational Evidence

Ms. Stokes was 50 years old at the time of her alleged onset date, and 52 years old at the time of the administrative hearing. (Tr. 39). Ms. Stokes completed high school. (Tr. 47). In the past, Ms. Stokes has been employed as a daycare worker, a laborer, and a caretaker for the disabled. (Tr. 47-49). She maintains an LLC, making popcorn for her friends and family in order to pay her bills. (Tr. 296).

### III.    Relevant Medical Evidence

### A.  Chronic Low Back Pain

On July 3, 2019, Ms. Stokes underwent an MRI of her lumbar spine in response to her complaints of sharp and throbbing low back pain and weakness in both legs. (Tr. 409). The findings were largely unremarkable and, in comparison to an MRI completed a year earlier on June 2, 2018, there was small focal eccentric disc protrusion on L1-L2 extending from the central zone to the left subarticular zone with no significant canal stenosis or neural foramen narrowing. (*Id.*).

Due to worsening pain in her back and leg, Ms. Stokes attended a follow-up appointment on September 30, 2019, with Muhammad Sheriff Hefzy, M.D. (Tr. 391). She endorsed constant, throbbing pain in her low back radiating down her left leg to the top of her foot, accompanied by numbness, tingling, and weakness. (*Id.*). The symptoms are exacerbated with prolonged standing and walking. (*Id.*) Ms. Stokes explained she had trouble walking from the clinic to the parking lot without sitting down to alleviate the pain, and also stated she must lean on a shopping cart while at the grocery store. (*Id.*). She must take breaks with simple activities including cooking and doing the dishes. (*Id.*). She had already undergone multiple interventions, including epidural steroid injections, medial branch blocks, and radiofrequency ablation without significant benefit. (Tr. 391, 394). Examination revealed decreased sensation on the lateral leg and dorsum of the foot. (Tr. 392).  A repeat lumbar and thoracic MRI was largely unremarkable but showed degenerative changes and disc bulging with no severe stenosis. (Tr. 391). Dr. Hefzy recommended a spinal cord stimulator trial. (*Id.*). Ms. Stokes was diagnosed with lumbar radiculopathy and lumbosacral

spondylosis without myelopathy. (Tr. 399). She attended physical therapy for six weeks for low back pain. (Tr. 568).

On December 14, 2020, Ms. Stokes underwent a pain block injection. (Tr. 887). On July 27, 2021, she had a bilateral transforaminal epidural steroid block, level L5. (Tr. 890). She continued to experience pain radiating down her legs bilaterally that limited her activities of daily life. (Tr. 1014). While she had good relief from prior epidural steroid injections, they provided only short-term benefits. (*Id.*).

**B.      Carpal Tunnel Syndrome and Degenerative Changes in Hands**

On August 2, 2019, A. Mustapha, M.D.,  diagnosed Ms. Stokes with ulnar nerve neuropathy and moderate carpal tunnel syndrome on the left. (Tr. 525). She experienced minimal relief with resting her bilateral wrist and using elbow splints. (Tr. 515). At a visit on September 6, 2019, Ms. Stokes endorsed worsening symptoms, and an EMG showed moderate carpal tunnel syndrome in her left hand as well as ulnar entrapment in the left elbow. (Tr. 460). She exhibited decreased sensation in her left upper arm, radial forearm, thumb, index finger, and middle finger. (Tr. 463).

On December 10, 2019, she had left carpal tunnel and cubital tunnel releases. (Tr. 511). The procedures helped with numbness and burning in her left hand, but she still had some pain with range of motion and some weakness in her hand. (Tr. 673).

At a follow-up appointment in January 2020, she reported complete resolution of numbness and tingling. (Tr. 674). She reported she had been caring for her grandson since October 2019 and she enjoyed reading and was still able to do it. (*Id.*). At a doctor's appointment in August of 2020, she reported taking care of a two- and three-year old during the day until her

grandson's mother came home every day at 6:00 pm, and that it could be exhausting. (Tr. 1129-30). She reported enjoying reading and doing crafts. (Tr. 1120). She could lift her grandson, who weighed fifty pounds. (Tr. 1129).

On September 8, 2020, she underwent a right carpal tunnel release and right ulnar nerve decompression. (Tr. 965). At a six-week follow up, she reported doing well, exhibiting full passive range of motion with no pain. (Tr. 1116). She requested to return to aquatic therapy and was instructed to perform all activities as tolerated with follow up necessary only if new problems arose. (*Id.*). However, at a visit on July 22, 2021, with Sean Machanda, M.D., Ms. Stokes reported she suffered carpal tunnel and bilateral trigger thumbs, for which she received injections that are "not controlling her pain adequately." (Tr. 1008).

Ms. Stokes was checked for arthritis in both hands on May 7, 2021. (Tr. 871). Degeneration with subluxation was noted of the proximal interphalangeal joint, fifth digit. (*Id.*). She had bilateral trigger thumbs and mild bilateral carpometacarpal arthritis, with most pain being brought about by the trigger thumbs. (Tr. 901). She failed a trial of injections to the right trigger thumb and proceeded with right thumb release on May 18, 2021. (Tr. 913). She had left trigger thumb A1 pulley release a week later, on May 25, 2021. (Tr. 904). In July 2021, Ms. Stokes returned, complaining of hand swelling that was worse at night, but reported no more triggering with her thumb. (Tr. 1020).

C.     **Migraines**

Ms. Stokes's migraines began in December of 2017. (Tr. 468). She stated she did not take anything to treat them, not even Motrin or caffeine, and had never been prescribed Imitrex. (Tr. 1008). She took Sumatriptan and felt worse, but then took Topamax and had fewer migraines. (Tr.

994). At a visit in June 2021, Ms. Stokes reported headaches but attributed them to clenching her teeth. (Tr. 1043). As of August 18, 2021, her migraines had improved on Topamax; she had four migraines in the past month versus daily, and only had other tension-like headaches three times a week. (*Id.*).

### D. Obesity

On April 8, 2019, Ms. Stokes was 5'4" and 220 pounds with a BMI of 37.8. (Tr. 396). On July 31, 2019, she was 222 pounds with a BMI of 38.1. (Tr. 460). On September 6, 2019, she was 224 pounds with a BMI of 38.4. (Tr. 712). As of August 18, 2021, Ms. Stokes weighed 204 pounds and her BMI was 35.1. (Tr. 990).

### E. Cervical Pain and Shoulder Pain

Ms. Stokes had an x-ray of her left shoulder in July 2019 that showed no acute bony abnormality and minor spurring. (Tr. 484-85). In September 2019, Ms. Stokes went to the doctor complaining of right shoulder pain after lifting her grandson who, at the time, weighed thirty pounds. (Tr. 453, 455). Medical records indicated Ms. Stokes had tenderness in the right shoulder and in the C5 area, but exhibited normal strength, normal active range of motion, and normal adduction, flexion, and extension. (Tr. 453, 456). An October 2019 x-ray of Ms. Stokes's right shoulder showed no acute findings, normal alignment, and no bony abnormality. (Tr. 478). She also had an x-ray of the cervical spine, which was unremarkable aside from reversal of the cervical lordosis and disc space narrowing at C5-C6, suggesting mild spondylosis, and no acute findings and normal alignment of the right shoulder. (Tr. 481).

An examination from January 2020 revealed normal motor strength and tone in the upper extremities. (Tr. 674). Ms. Stokes was prescribed medication and referred to physical therapy. (Tr.

666, 674). She missed several therapy appointments during September through November 2020, and continued to complain of neck pain. (Tr. 949-52, 967-69). In December 2020, Ms. Stokes received a medial branch block in the cervical spine. (Tr. 947).

### F.      Mental Health

On October 7, 2019, Ms. Stokes reported to her primary care provider that her mood was well controlled and she was having no issues with her medications, which were refilled. (Tr. 456). She returned to her primary care provider in January 2020, reporting sleeping issues and worsened mood. (Tr. 674). She related increased stress due to finance and family issues, staying to herself and avoiding friends. (*Id.*).  Ms. Stokes stated she was unsure whether her mental health medications were helping any longer and asked to try something different. (*Id.*). She also requested a referral to counseling. (*Id.*). Her psychiatric examination revealed a normal mood and affect, and she was active and alert. She was provided a referral for counseling and the Fluoxetine was changed to Pristiq. (*Id.*).

On March 31, 2020, Ms. Stokes had a consultation with Alina Rais, M.D., where she reported being depressed, experiencing "lots of family issues," and symptoms of anxiety. (Tr. 376, 786). She was alert, cooperative, and pleasant, with normal eye contact; her speech and language were normal; her mood was depressed and affect broad; her thought process was goal-directed and linear; she was oriented and able to focus and remember; her intelligence was estimated at average, and insight and judgment were intact. (Tr. 788). She was continued on Wellbutrin and started on Effexor and Trazodone and recommended to continue therapy (Tr. 786-88).

At a psychiatry follow-up in October 2020, Ms. Stokes reported she was doing "OK," but her mood had been up and down. (Tr. 1120). She reported feeling overwhelmed with managing

her grandchildren. (*Id.*). Her dose of Trazodone was increased, and she was restarted on Effexor (she had exhausted her supply). (*Id.*).

At a psychiatry follow-up visit on November 23, 2020, Ms. Stokes reported a depressed mood, anhedonia, and poor sleep, energy, concentration, and appetite. (Tr. 943-44). She endorsed crying spells and occasional feelings of hopelessness but denied any suicidal ideation, intent, or plan. (Tr. 944). Her Prozac was discontinued, and she was continued on Trazodone, Effexor, and Wellbutrin. (*Id.*). In January 2021, her dose of Trazodone was further increased to help with sleep, noting if sleep improved her mood and anxiety would improve (Tr. 1105).

In May 2021, Ms. Stokes's dose of Effexor was increased. (Tr. 1067). When she returned the following month, she reported her mood had been good, rating it at a 5/10. (Tr. 1043). She stated her energy level was sometimes good and sometimes bad, her crying spells had been reduced, her concentration was "ok," and focus was improved (*Id.*). Ms. Stokes continued to report poor appetite and some feelings of hopelessness. (*Id.*). With respect to her anxiety, she reported some irritability and worry. (*Id.*). She further reported having nightmares and endorsed some flashbacks, and some avoidance such as watching TV shows; however, she endorsed a reduction in her hypervigilance. (*Id.*). She was alert and oriented and her thought process was logical, coherent, relevant, goal-directed, and linear. (*Id.*). She was able to focus and sustain attention and memory was appropriate for conversation. (*Id.*). Her medications were continued (Tr. 1043-1044).

## IV.    Medical Opinions

State agency medical consultants reviewed Ms. Stokes's record at the initial and reconsideration levels.

State agency physician Mehr Siddiqui, M.D., reviewed Ms. Stokes's medical records on February 22, 2020, at the initial stage of the administrative process. (Tr. 81-88). Dr. Siddiqui concluded Ms. Stokes could perform work at the light level but had the following postural limitations: she could frequently climb ramps and stairs; never climb ladders, ropes, or scaffolds; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 87). Dr. Siddiqui also noted she could frequently reach overhead with the right upper extremity, frequently handle and finger with both upper extremities, but should avoid unprotected heights and heavy machinery. (Tr. 87-88).

State agency physician Gail Mutchler, M.D., reviewed Ms. Stokes's medical records on August 31, 2020, at the reconsideration stage. (Tr. 101-08). Dr. Mutchler agreed she could perform light work but noted she could occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; frequently balance, kneel, crouch, and crawl; and occasionally stoop. (Tr. 106). Dr. Mutchler limited Ms. Stokes to frequent front, lateral, and occasional overhead reaching on the right and frequent handling, fingering, and feeling on the right. (Tr. 107). Dr. Mutchler noted she should avoid all exposure to hazards. (Tr. 107).

Deryck Richardson, Ph.D., reviewed Ms. Stokes's mental health records on January 4, 2020, at the initial stage of the determination. (Tr. 81-85). Dr. Richardson concluded Ms. Stokes did not have a severe mental impairment, noting she had no more than a mild limitation in the four functional areas. (Tr. 85).

On February 11, 2021, Ms. Stokes attended a consultative psychological evaluation with Ryan R. Wagner, Psy.D. (Tr. 851-56). She reported difficulties with depressive symptoms, symptoms suggestive of PTSD, and occasional panic attacks. (Tr. 852-54). She appeared appropriately groomed and dressed. (Tr. 853). She reported difficulty with concentration and

mental errors but stated she could pay bills and did not describe difficulty managing her medications. (*Id.*). She gave a history of problems with concentration in work settings (Tr. 855). Ms. Stokes described regular contact and generally positive relationships with family and periodic contact with others, but social withdrawal was noted. (Tr. 853). Nevertheless, she was positive and rapport was adequately established. (*Id.*). She was appropriately dressed and had appropriate grooming and hygiene. (*Id.*). Speech and thought processes were intact. (*Id.*).  She presented as anxious with a restrictive affect, looked down through most of the interview, but displayed adequate energy. (*Id.*).

Ms. Stokes was alert and oriented, could track the conversation without significant difficulty, and recalled personal history information without significant difficulty. (Tr. 854). She recalled six digits forward, four backward and one out of three words after a brief delay. (*Id.*). Ms. Stokes completed two iterations accurately of an exercise in counting backward from 100 by 7 in 30 seconds, and six iterations with one error in counting backward from 20 by 3 in 44 seconds. (*Id.*). She could accurately compute basic mathematical computations, could describe the similarity between some objects but not others, could name three cities in the world, and knew there were 60 seconds in a minute. (*Id.*). Her intellectual functioning fell within normal limits and her insight and judgment were assessed as adequate (Tr. 854-55).

Dr. Wagner opined Ms. Stokes would have difficulty understanding instructions, but no difficulty remembering instructions. (Tr. 855). He noted she was highly anxious, which may impact social engagement in the work setting including social avoidance. (*Id.*). However, Dr. Wagner noted Ms. Stokes did not demonstrate intellectual difficulties impacting her ability to understand and respond to supervisor feedback. (*Id.*). Dr. Wagner noted she presented as emotionally

13

overwhelmed, which may impact her mood stability in a competitive work setting. (*Id.*). However, Dr. Wagner noted there was no indication of cognitive or intellectual limitation impacting Ms. Stokes's ability to manage normal work pressures. (*Id.*).

Robert Baker, Ph.D., reviewed Ms. Stokes's mental health records on March 20, 2021, at the reconsideration stage. (Tr. 101-09). He concluded the updated medical evidence demonstrated a change since the initial determination indicating Ms. Stokes had a moderate limitation in the four functional areas. (Tr. 103). Dr. Baker concluded she could perform simple tasks up to 5 steps, concentrate sufficiently for completion of one to three step tasks, and work in a setting with occasional superficial interactions with others. (Tr. 108). Dr. Baker noted Ms. Stokes needed occasional flexibility with breaks when experiencing increased symptoms but was able to work in a setting with limited interaction with the general public, where supervisory feedback was supportive and constructive. (Tr. 109). Dr. Baker concluded she could work in a setting without frequent or major changes to work routine, and where advance notice of major changes was gradually implemented. (Tr. 108-09).

### THE ALJ'S DECISION

The ALJ's decision, dated October 26, 2021, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since October 7, 2019 the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease C5-7, L5-S1 and L1-3, major depressive disorder, generalized anxiety disorder

and posttraumatic stress disorder (PTSD). (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she can frequently climb ramps and stairs; never climb ladders, ropes or scaffolds; frequently balance, stoop, kneel, crouch and crawl; frequently reach overhead with the bilateral upper extremities; frequently handle and finger bilaterally; avoid all exposure to unprotected heights and heavy moving machinery; can understand, remember, and carry out simple instructions; [p]erform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; adapt to routine changes in the workplace that are infrequent and easily explained; interact occasionally with supervisors and coworkers, and the general public.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on August 28, 1969 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date. (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education. (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 7, 2019, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-31).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

**I.      The RFC's manipulative and postural limitations are supported by substantial evidence.**

First, Ms. Stokes argues the ALJ's manipulative and postural limitations within the residual functional capacity (RFC) assessment were not supported by substantial evidence. (Pl.'s Br., ECF #11, PageID 1205). Specifically, she argues three separate errors: (1) her hand impairments are severe and not sufficiently reflected in the RFC; (2) her degenerative cervical disc disease and right shoulder impairment are severe and not properly accounted for in the RFC; and (3) her severe

18

degenerative lumbar disc disease results in postural limitations contrary to the RFC's light exertional limitation. (Pl.'s Br., ECF #11, PageID 16-24). I find none persuasive.

### A.  Hand impairments

The ALJ found Ms. Stokes's osteoarthritis in her hands caused no more than a minimal limitation in her ability to perform basic work activities, therefore rendering it a non-severe condition. (Tr. 18). In reaching this conclusion, the ALJ relied on evidence that Ms. Stokes had been prescribed Naproxen and referred to a rheumatologist, but there were no further follow-up or diagnostic studies relating to the condition to determine if it had improved. (*Id.*). The ALJ explained there was no indication in the record the osteoarthritis had worsened or causes more than a minimal limitation in her ability to perform tasks. (*Id.*).

The only potential argument regarding the osteoarthritis within Ms. Stokes's brief reads as follows:

> ALJ noted, Tr.18, "claimant has been diagnosed with obesity, hypothyroidism, osteoarthritis of the hands, bilateral carpal tunnel syndrome, bilateral trigger thumb...", but the OA of hands, on imaging was minimal 5/2021, Tr.870-1, He concluded OA is not severe. He stated in 1/2021 plaintiff returned to orthopedic specialist, reported pain in right thumb but denied numbness or tingling Tr.1091,1094-5. She was also seen for left thumb complaints. Conservative treatments failed, she had trigger surgeries right thumb 5/18/21 and a week later left thumb. Tr.904,913 By 7/21 per ALJ, she reported no more triggering, Tr.1020, but plaintiff continued problems from OA after surgeries. <u>Evidence is contrary to ALJ's findings.</u>

(Pl.'s Br., ECF #11, PageID 1210). This summarizes the same evidence the ALJ relied on in determining the osteoarthritis was non-severe. Even if Ms. Stokes had "continued problems from OA after surgeries," she does not cite any record evidence in support of these "continued problems." She acknowledges the only imaging completed in 2021 revealed the osteoarthritis to be minimal. Merely summarizing the same evidence and stating "evidence is contrary to ALJ's

findings" does not provide any clarity as to why Ms. Stokes believes the ALJ's conclusion regarding her osteoarthritis was error. I therefore reject this argument.

Next, Ms. Stokes challenges the ALJ's determination her bilateral carpal tunnel syndrome does not meet the durational requirements of a severe impairment. Ms. Stokes's brief then goes on to say:

> However, to be clear, counsel is not focusing on Step 2 of sequential evaluation, Courts have held that failure to include an impairment is not fatal if there is another several impairment requiring going to steps 4 and 5. Counsel's argument goes straight to **whether ALJ properly included all proper and necessary limitations on plaintiff's hands as part of ALJ's Finding regarding RFC/MRFCA.**

(Pl.'s Br., ECF #11, PageID 1207). Accordingly, I interpret Ms. Stokes's brief as only challenging whether the ALJ properly accounted for Ms. Stokes's bilateral carpal tunnel syndrome in formulating the RFC. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) ("[E]ven if the ALJ erred at step two, the ALJ's consideration of the cumulative effect of [claimant]'s impairments (both severe and non-severe) throughout the remaining steps of the analysis rendered any error harmless.").

The ALJ limited Ms. Stokes to frequent handling and fingering bilaterally. (Tr. 22). The terms "occasional" and "frequent" are terms of art in Social Security law. "Occasional" means occurring from very little to up to 1/3 of the time. Social Security Ruling (SSR) 83-10, 1983 WL 31251. "Frequent," however, means occurring from 1/3 to 2/3 of the time. *Id.*

An ALJ is not required to include restrictions on handling and fingering in the RFC based on a diagnosis of carpal tunnel syndrome where the claimant's physicians have not imposed such restrictions. *Thiel v. Comm'r of Soc. Sec.*, No. 1:13-CV-1216, 2015 WL 4644794, at *7 (W.D. Mich. Aug. 4, 2015). Ms. Stokes refers to ample evidence in the record, mostly undisputed, of her carpal

tunnel syndrome and related pain and discomfort, but references no medical evidence demonstrating specific manipulative limitations found to be caused by her condition. *See Robinson v. Comm'r of Soc. Sec. Admin*, No. 1:12CV1913, 2013 WL 5406672, at *9 (N.D. Ohio Sept. 25, 2013). Thus, she has not met her burden to show additional limitations were warranted. *Id.*; *see also Irizarry v. Colvin*, No. 1:13–CV–02161, 2014 WL 6879117, at *13 (N.D. Ohio Dec. 4, 2014) ("Without any evidence from a physician indicating that Plaintiff's carpal tunnel syndrome requires specific restrictions not included in Plaintiff's RFC, this Court is not in a position to decide whether the ALJ erred in determining Plaintiff's physical capabilities.").

The most recent medical records addressing Ms. Stokes's bilateral carpal tunnel syndrome indicate she was doing well six weeks after her September 8, 2020 right carpal tunnel release surgery and was only to follow-up as needed, which the ALJ cited. (Tr. 18). After that, Ms. Stokes did not follow up for any pain, numbness, tingling, or inability to use her hands as a result of her bilateral carpal tunnel syndrome.

In January 2021, Ms. Stokes returned to an orthopedic specialist reporting pain in her right thumb, but continued to deny numbness or tingling. (Tr. 1091, 1094-95). After conservative treatments failed, she had surgery on her right thumb on May 18, 2021 and surgery on her left thumb for triggering. (Tr. 904, 913). As of July 2021, she reported no more triggering. (Tr. 1020). The medical records do not indicate she was having any continuing problems with her hands after that time.

Additionally, while Ms. Stokes's brief argues she was not in a position to use her hands on a frequent basis until September 8, 2020, the Commissioner points out on January 23, 2020, she reported she had been taking care of her grandson since October 2019, the same month Ms.

21

Stokes alleged she was disabled. (Tr. 25, citing Tr. 266, 673). As the ALJ noted, Ms. Stokes continued taking care of small children through October 2020 including picking them up. (Tr. 25, citing Tr. 954, 1129). And, during that period, she reported enjoying reading and doing crafts, requiring use of her hands. (Tr. 673, 1130). Some activities of daily living, such as the ability to shop and do housework with help, is not necessarily equivalent to being able to engage in independent use of one's hands. *Toohey v. Comm'r of Soc. Sec.*, No. 2:20-CV-02555, 2021 WL 940288, at *9 (S.D. Ohio Mar. 12, 2021), *report and recommendation adopted,* 2021 WL 1383351 (S.D. Ohio Apr. 13, 2021). However, in light of the resolution of Ms. Stokes's symptoms and the lack of medical evidence indicating some inability to use her hands, these activities of daily living certainly indicate she was able to do some handling and fingering. The ALJ also noted in February of 2020, she denied any dexterity issues in her hands. (Tr. 25).

Without references to medical evidence demonstrating specific manipulative limitations found to be caused by her condition, I can only conclude the ALJ's decision is supported by substantial evidence.

### B.      Degenerative Cervical Disc Disease and Shoulder Impairment

Ms. Stokes argues her degenerative cervical disc disease and right shoulder impairment prevent her from working. (Pl.'s Br., ECF #11, PageID 1211). Ms. Stokes's brief confusingly pivots between claiming the conditions should have been found severe (the degenerative disc disease was, the shoulder impairment was not) and claiming they are not adequately accommodated in the RFC. Again, I will interpret Ms. Stokes's brief to challenge only whether the ALJ properly accounted for Ms. Stokes's degenerative cervical disc disease and right shoulder impairments in

formulating the RFC, because the ALJ found other conditions to be severe, rendering any such error harmless. *Nejat*, 359 F. App'x at 577.

Ms. Stokes argues the ALJ failed to "construct the logical bridge" between finding degenerative cervical disc disease was severe and the Step Five finding Ms. Stokes could "frequently reach overhead with the bilateral upper extremities." (Pl.'s Br., ECF #11, PageID 1213). This misunderstands the "logical bridge" framework. The ALJ is not required to build a "logical bridge" between findings at Step Two and findings at Step Five; rather, the reasons given by the trier of fact must build an accurate and logical bridge between *the evidence* and *the result*. *Fleischer*, 774 F. Supp. 2d at 877. Specifically, Ms. Stokes argues "[the] ALJ essentially found no vocationally relevant limitation on her ability to reach having [a] 'significant impact on work- related activities', contrary to [the ALJ] finding the impairment 'severe.'" (Pl.'s Br., ECF #11, PageID 1213).

Again, "frequently" is a term of art used in Social Security determinations. "Frequent," meaning occurring from 1/3 to 2/3 of the time, is not "vocationally irrelevant" as Ms. Stokes alleges. Social Security Ruling (SSR) 83-10, 1983 WL 31251. The ALJ could have found Ms. Stokes had no limitation at all on her ability to reach bilaterally overhead. Instead, considering the evidence Ms. Stokes has trouble doing so, the ALJ found the evidence supported moderate amounts of reaching, from 1/3 to 2/3 of the time.

The ALJ explicitly considered Ms. Stokes "has problems with her left, but not her right, shoulder and cannot reach overhead. However, the claimant testified due to problems with her right wrist, she would have difficulty lifting overhead." (Tr. 23).[1] The ALJ acknowledged cervical

---

[1]     There appears to be confusion over whether Ms. Stokes's right shoulder or left shoulder is impaired. Ms. Stokes testified that "[m]y left shoulder is the one that's really, really bad," (Tr. 55) and "[n]o, it's my left shoulder. It's not my right shoulder." (Tr. 66). In brief, Ms.

spine x-rays dated January 23, 2020 showed multilevel degenerative disc disease with mild anterolisthesis of C3 on C4 and C4 on C5 that was decreased with flexion but no acute ossific abnormality. (Tr. 25).

The ALJ reiterated the state agency medical opinion of Dr. Siddiqui that Ms. Stokes could be successfully limited to frequent overhead reaching with the right extremity and no limitation on overhead reaching with the left extremity. (Tr. 27). The ALJ explained that this opinion was only partially persuasive given the medical record and Ms. Stokes's testimony supported the more restrictive limitation of frequent overhead reaching with *both* extremities. (*Id.*).

The ALJ referenced Dr. Mutchler's opinion at the reconsideration stage that Ms. Stokes should be limited to frequent front/lateral and occasional overhead reaching on the right extremity, which the ALJ rejected considering Ms. Stokes's testimony described no difficulty in performing these motions. (Tr. 28). Additionally, the ALJ pointed out Ms. Stokes's level of activity, which includes caring for a two-year-old grandson on a regular basis, is contrary to such a finding. (*Id.*). The ALJ did find Ms. Stokes is properly limited to frequent handling and fingering bilaterally

---

Stokes argues the right, rather than the left, shoulder should have been accommodated in the RFC, but then references problems in both shoulders as support for the argument. (*See* Pl.'s Br., ECF #11, PageID 1211-13). Medical records indicate her left shoulder demonstrates positive findings on the Hawkins and Neer's impingement tests with forward flexion approximately 90 degrees, 5/5 rotator cuff strength. (Tr. 1061). Records indicate identical findings in the right. (Tr. 456).

The ALJ interprets Ms. Stokes's testimony to indicate she experiences problems with her left, but not her right shoulder. (Tr. 23). However, the ALJ also acknowledged the history of left shoulder pain with imaging showing no acute findings and minor spurring. (Tr. 24). Because the medical records, briefs, and ALJ opinion all refer to both shoulders, both are relevant; however, the ALJ's RFC limited Ms. Stokes to frequently reach overhead with *either* arm. (Tr. 22). Therefore, I limit my review to whether the ALJ's RFC restricting *both* arms to frequent reaching overhead is supported by substantial evidence.

and frequent overhead reaching bilaterally, given her non-severe bilateral hand/wrist impairments and treatment history. (*Id.*).

While Ms. Stokes argues the medical evidence supports a limitation of only occasional overhead lifting primarily due to her left shoulder, she does not connect her recitation of the medical records with an inability to perform moderate amounts of reaching, from 1/3 to 2/3 of the time. The ALJ adequately identified the opinions he found consistent with the remainder of the record and explained why he rejected other opinions. Even if substantial evidence supports a limitation of occasional overhead reaching, substantial evidence also supports the ALJ's determination Ms. Stokes could be properly limited to frequent overhead reaching. Therefore, I cannot disturb the ALJ's finding. *Jones*, 336 F.3d at 477.

I find Ms. Stokes's second argument insufficient to warrant remand.

**C.      Degenerative Lumbar Disc Disease (L5-S1, L1-3)**

In her third argument, Ms. Stokes once again does not make clear whether she challenges the failure to find her degenerative lumbar disc disease to be a severe impairment or the failure of the ALJ to fully accommodate it in the RFC. And, again, the ALJ *did* find the lumbar disc disease (at L5-S1 and L1-L3) to be severe. (Tr. 17). Taking the argument only in the context of the RFC, then, Ms. Stokes merely summarizes the medical records related to her lumbar disc disease and summarily concludes the ALJ "neglected" and "minimized" such evidence. (Pl.'s Br., ECF #11, PageID 1217).

"[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125

25

F.3d 989, 995–96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995) (citations omitted)). Without more effort at developed argument, I must deem this argument is waived.

Moreover, I find the ALJ's lumbar restrictions contained in the RFC are supported by substantial evidence. The ALJ noted a lumbar MRI dated March 5, 2021 showed a small annular tear with disc protrusion at L5-S1 associated with mild bilateral neural foraminal narrowing, mild bilateral foraminal disc protrusion at L2-L3, and a small left foraminal disc protrusion at L1-L2. (Tr. 25). A few months later, in July of 2021, Ms. Stokes reported ongoing pain in her lumbar spine, but exhibited normal gait and station and was able to lie on the floor. (Tr. 26). She received a bilateral epidural injection at L5 that same month. (*Id.*). The ALJ not only found Ms. Stokes's degenerative disc disease at L5-S1 and L1-3 severe, but he limited her to light work and partially credited the prior administrative medial findings of Dr. Siddiqui, who considered Ms. Stokes's lumbar impairment and assessed functional limitations. (Tr. 17, 22, 27-28).

Ms. Stokes does not explain why this determination "minimized" the record evidence. Without more, I am unable to disturb the ALJ's finding that Ms. Stokes's lumbar conditions do not prevent her from completing light work, and I recommend the District Court do the same.

## II.  The ALJ properly considered Ms. Stokes's obesity in forming the RFC.

Ms. Stokes next argues the ALJ did not properly assess her obesity in accordance with SSR 19-2P, and believes such error renders the RFC not supported by substantial evidence. (Pl.'s Br., ECF #11, PageID 1217).

SSR 19-2p states:

> When we evaluate the severity of obesity, we consider all evidence from all sources. We consider all symptoms, such as fatigue or pain that could limit

26

functioning. We consider any functional limitations in the person's ability to do basic work activities resulting from obesity and from any other physical or mental impairments. If the person's obesity, alone or in combination with another impairment(s), significantly limits his or her physical or mental ability to do basic work activities, we find that the impairment(s) is severe. We find, however, that the impairment(s) is "not severe" if it does not significantly limit [a person's] physical or mental ability to do basic work activities.

No specific weight or BMI establishes obesity as a "severe" or "not severe" impairment. Similarly, a medical source's descriptive terms for levels of obesity, such as "severe," "extreme," or "morbid," do not establish whether obesity is a severe impairment for disability program purposes. We do an individualized assessment of the effect of obesity on a person's functioning when deciding whether the impairment is severe.

*** 

A person may have limitations in any of the exertional functions, which are sitting, standing, walking, lifting, carrying, pushing, and pulling. A person may have limitations in the nonexertional functions of climbing, balancing, stooping, kneeling, crouching, and crawling. Obesity increases stress on weight-bearing joints and may contribute to limitation of the range of motion of the skeletal spine and extremities. Obesity may also affect a person's ability to manipulate objects, if there is adipose (fatty) tissue in the hands and fingers, or the ability to tolerate extreme heat, humidity, or hazards.

SSR 19-2p, 2019 WL 2374244.

When considering what, if any, of Ms. Stokes's conditions were severe, the ALJ explained:

Specifically, the claimant has been diagnosed with obesity, hypothyroidism, osteoarthritis of the hands, bilateral carpal tunnel syndrome, bilateral trigger thumb, and migraines. The most record shows a BMI of 35.2 (18F/2), which is categorized as Level II obesity (Clinical Guidelines on the Identification, Evaluation, and Treatment of Overweight and Obesity in Adults (NIH Publication No. 98-4083, September 1998)). The claimant's obesity has been considered under Social Security Ruling 19-2p and is found to be non-severe as it does not significantly limit the claimant's physical or mental ability to do basic work activities. The hypothyroidism has been managed medically and should be amenable to proper control by adherence to recommended medical management and medication compliance. No aggressive treatment was recommended or anticipated. Accordingly, it is found to be non-severe.

27

(Tr. 18). Even still, the ALJ included limitations within the RFC to accommodate Ms. Stokes's obesity as it exacerbates her other physical impairments:

> In sum, the claimant's physical impairments and obesity prevent her from performing work at greater than the light exertional level, with additional limitations on climbing and performing other postural movements, reaching overhead with the bilateral upper extremities, handling and fingering with the bilateral upper extremities, and working around environmental conditions such as workplace hazards.

(Tr. 29).

Ms. Stokes argues this explanation is insufficient; instead, she asserts that the ALJ "must show how obesity was considered to specific impairments and would impact such impairments . . . [f]urther, [the] ALJ must indicate from record evidence that obesity was not a significant contributing factor to increasing severity of these other conditions." (Pl.'s Br., ECF #11, PageID 1218). Specifically, Ms. Stokes argues her obesity should have been assessed in its exacerbation of her low back pain, decreased lumbar active range of motion, decreased lower extremity strength, decreased lower extremity flexibility, and increased pain, all of which prevented her from standing, lifting, and carrying objects. (*Id.* at PageID 1220-21).

However, Ms. Stokes does not identify any statements from medical professionals, her testimony, or any other evidentiary source indicating her obesity caused more limitations than those encompassed in the RFC. Given the absence of any evidence her obesity has increased the severity of her other limitations, the record demonstrates the ALJ sufficiently considered her obesity in formulating the RFC. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir.2011); *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009).

For example, in a similar case, a claimant challenged the ALJ's SSR 19-2p analysis, which stated: "[t]he medical record does not evidence that any of the claimant's treating providers have

28

listed any specific functional limitations due to obesity. However, when considering the combination of the claimant's obesity and his other impairments, the reduction to the light exertional level above is appropriate." *Walker v. Comm'r of Soc. Sec.*, No. 1:21-CV-01474-JG, 2022 WL 2612244, at *10 (N.D. Ohio May 17, 2022), *report and recommendation adopted*, 2022 WL 4479922 (N.D. Ohio Sept. 27, 2022). The Magistrate Judge rejected the challenge, finding the ALJ's determination met the requirements of SSR 19-2p. *Id.* Specifically, the Magistrate Judge explained "the ALJ recognized that Walker's obesity affected his other impairments and limited him to the light exertional level. Walker did not point to any medical record that demonstrated that his obesity caused any specific functional limitation." *Id.*

The same is true here. The ALJ limited Ms. Stokes to light exertion given her conditions in combination with her obesity. Ms. Stokes has not pointed to any medical record or opinion that indicates her obesity would cause any particularized functional limitation. The ALJ's decision is thus supported by substantial evidence.

III.     **The ALJ's RFC appropriately accounted for Ms. Stokes's mental limitations.**

Finally, Ms. Stokes challenges the ALJ's failure to account for certain mental limitations in the hypotheticals proffered to the VE, and thus, argues the VE's testimony cannot be relied upon as evidence for an unfavorable decision. (Pl.'s Br., ECF #11, PageID 1221). As support, she cites consultative psychological examiner Dr. Wagner's finding Ms. Stokes is "highly anxious which may impact social engagement in work settings including social avoidance" and "emotionally overwhelmed when discussing current pressures" that would "impact her mood stability in competitive employment." (*Id.* at PageID 1222-23; Tr. 855). She has poor concentration,

experiences crying spells, and would likely miss more than one day a month in excess of the allowable absences, as well as needing extra breaks. (*Id.* at PageID 1223).

Whether the VE's testimony can be relied on based on the conditions listed in the hypothetical is inapposite unless the ALJ's question (and therefore, the RFC) is not supported by substantial evidence. The ALJ is not required to credit limitations he found unsupported because "[i]t is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). I find the ALJ's limitations are supported by substantial evidence.

The ALJ determined Ms. Stokes had the mental RFC to understand, remember, and carry out simple instructions; perform simple, routine, and repetitive tasks but not at a production rate pace such as an assembly line; and adapt to routine changes in the workplace that are infrequent and easily explained. (Tr. 22). The ALJ also reasonably concluded Ms. Stokes could interact occasionally with supervisors, coworkers, and the general public. (*Id.*).  The ALJ's determination was generally consistent with Dr. Baker's prior administrative medical findings Ms. Stokes had limitations in the four functional areas. (Tr. 22, 108-09).

The ALJ based this determination on Ms. Stokes's high school diploma; her ability to pay bills, count change, and handle a bank account; her ability to follow instructions, although sometimes needing repetition; her ability to take care of her personal needs, take her medicine, and go places without reminders; consistent alertness and orientation on examination; and the ALJ's observation of Ms. Stokes at the hearing. (Tr. 20).

Regarding interaction with others, the ALJ observed Ms. Stokes can go out alone, regularly spends time with others, and has no difficulty getting along with others; she goes to the store and describes no social difficulty. (Tr. 20). The ALJ noted while there were intermittent reports in the record of irritability and relationship issues with some family members, Ms. Stokes was consistently cooperative with no difficulty getting along with authority figures, medical providers, and supervisors. (Tr. 20-21).

While Ms. Stokes reported difficulty with concentrating and paying attention, the ALJ observed she was consistently able to focus, track the flow of conversation, and demonstrated adequate energy at the consultative psychological evaluation without the need to repeat questions or instructions. (Tr. 21).

Finally, the ALJ referenced records reflecting Ms. Stokes's ability to maintain independence in personal care in grooming, including some cooking and housekeeping. (Tr. 21). The ALJ emphasized that Ms. Stokes maintains an LLC and makes and sells popcorn, albeit on a limited basis, to friends and family; takes care of her two-year-old grandchild; and exhibited no episodes of decompensation or need for urgent mental health care during the relevant time period. (Tr. 21).

The ALJ meticulously laid out Ms. Stokes's history of mental health treatment with her primary care physician, psychiatry consults, and consultative psychological evaluation. (Tr. 26-27). In fact, the ALJ rejected the state agency mental health consultant at the initial level of determination as inconsistent with the overall record because he determined Ms. Stokes had no more than a mild limitation in all four "paragraph B" criteria. (Tr. 28). By contrast, the ALJ found her to have a moderate limitation in all four areas. (Tr. 20-21).

While Ms. Stokes argues her mental limitations would require absences that would be work-prohibitive, the ALJ's conclusion to the contrary is adequately supported. Substantial evidence supports moderate limitations in Ms. Stokes's abilities to understand, remember, and apply information; interact with others; concentrate, persist, and maintain pace; and adapt or manage herself. Accordingly, I reject Ms. Stokes's final argument.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: February 17, 2023.

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation.** *Berkshire v. Dahl,* **928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object."** *Howard v. Sec'y of Health and Hum. Servs.,* **932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the**

arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).